**FIRST DIVISION**
**BARNES, P. J.,**
**GOBEIL and PIPKIN, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**June 20, 2024**

# In the Court of Appeals of Georgia

A24A0099. IN THE INTEREST OF A. S., a child.

PIPKIN, Judge.

The juvenile court in this case approved a change of placement for A. S., a dependent child; her mother ("the Mother") now appeals that order. For the reasons that follow, we affirm.

In July 2021, A. S. was residing in Whitfield County with her half-brother, the Mother, and the Mother's husband, Damon. As relevant here, A. S. and her half-brother were removed from the home following repeated incidents of domestic violence by Damon against the Mother.[1] In August 2021, the juvenile court conducted

---

[1] There were other circumstances underlying the half-brother's removal from the home, but those circumstances are not relevant to this appeal, and we do not address them.

a two-day hearing on the pending dependency petition and entered an order in the matter. In that order, the juvenile court described the "plethora" of medications that Damon was using, including hydrocodone (that he would snort) and methamphetamine hydrochloride; the juvenile court noted that the evidence showed that Damon's "mismanagement" of this medication -- for which he could produce no prescription -- would sometimes result in "drug-induced schizophrenia." The August 2021 order also detailed the circumstances surrounding A. S.'s removal from the home, stating, in relevant part, as follows:

> [o]n July 23, 2021, [law enforcement] responded to a call at the home of the [family]. The Mother was home. [Damon] had left the scene. The children were staying with their grandparents. . . . Mother was missing her cell phone, her identification card and her iPad. She was upset, telling the officers that the [Damon] took them from her and that he was controlling. She stated that he was acting paranoid, had been threatening her, [had] recently slashed her tires on her vehicle and had recently threatened suicide, causing Mother to hide a firearm by throwing it into the woods. At that same time, [Damon] approached a law enforcement officer . . . at a different location. . . . . When asked, [Damon] stated he did not have the Mother's items[, but] [a]fter giving consent to search his vehicle, the Mother's cell phone was located, as well as a computer and an iPad. On this day, the Mother did leave the home and went to a woman's shelter. There have been other occasions where law enforcement came to the home for domestic violence calls between the Mother and [Damon]. The Mother admits that there is emotional abuse that occurs between [Damon] and her, that she believes it is at least in part caused by [Damon's] medication mismanagement and that the

emotional abuse does affect her and both children. To date[,] the Mother has not taken steps to remedy the situation and prevent the children from continued emotional abuse and harm.

(Emphasis omitted). Accordingly, the juvenile court deemed A. S. dependent and placed her in the custody of the Georgia Department of Human Services through the Whitfield County Department of Family and Children Services ("the Department").

Following the dependency determination, A. S. was legitimated by her biological father, R. S., who was then incarcerated in Florida. In July 2022, the Department requested that the juvenile court set a hearing to consider the Department's plan to place A. S. with her paternal grandmother in Florida. Mother apparently objected to the placement because, among other reasons, she believed that she was close to completing her case plan, which, she believed, would allow her to be reunified with A. S.

At a hearing in February 2023, the juvenile court received evidence and testimony. Mother testified that, at the time of the hearing, she was living with her in-laws -- who are estranged from Damon -- and that A. S. had been removed from her care for approximately 18 months. Mother acknowledged that she had lived out of state in either Tennessee or South Carolina for approximately 6 or 7 of those 18

months. When asked about her work toward satisfying her case plan, the Mother testified as follows: that, in December 2022, she had completed a therapy program in South Carolina at a place called "Shoreline"; that she had recently participated in at least one of her domestic violence therapy sessions; that she had stable and furnished housing that was adequate to accommodate her children; that she was employed; and that she had a vehicle with car seats.

Mother acknowledged, however, that the Department had not evaluated her housing situation and that she had only been employed for two weeks. Further, despite acknowledging that Damon was the cause of the circumstances giving rise to A. S.'s dependency, Mother testified that she had remained involved with Damon following A. S.'s removal from the home, that she had been living with Damon and was subject to his abuse as late as September or October 2022, that the couple had not yet divorced, and that the vehicle was still titled in Damon's name.

The juvenile court also received testimony from A. S.'s paternal grandmother, who testified that she was willing and able to care for A. S., that she had already obtained custody of other grandchildren, that her home had been inspected by the State of Florida, and that she would honor the Mother's right to communicate and

visit with A. S. Next, the juvenile court received testimony from a representative of the Department, who explained that the Mother had not yet completed her required counseling and training specific to domestic violence and, further, that the Mother still needed to provide proof of income, housing, and stability. Finally, A. S.'s foster mother testified that, despite A. S. being removed from the home, the Mother had continued her relationship with Damon and had not accepted offers of help to remove herself from that relationship. Further, according to the foster mother, the paternal grandparents had been actively participating in A. S.'s life through telephone calls, video conferences, and monthly visits, while the Mother's contact was "sporadic" at times and limited to "weekly visits and video conferences."

In a detailed order entered in February 2023, the juvenile court approved the Department's placement recommendation. In that order, the juvenile court first determined that, while it was Damon's "behaviors, unremediated mental health," and "substance abuse issues" that underpinned A. S.'s dependency, the Mother chose to continue her relationship with Damon. The juvenile court explained that, while the Mother may currently be separated from Damon, she had a history of separating from him and then reconciling with him; the trial court also noted that the Mother was still

5

married to him and that she was living with his parents. In short, the trial court found that the "evidence shows that while the Mother is perhaps taking steps to remove herself from her relationship with [Damon], it is nowhere near a completed process" and, further, that A. S. "remains dependant due to ongoing domestic violence between the Mother and [Damon]." Likewise, while the juvenile court credited the Mother for working toward completing the requirements of her case plan, the court recognized that the Mother's income had not been verified and that she had yet to complete the domestic violence related counseling and training.

With respect to the Mother's objection to the placement, the juvenile court explained that "the Mother voluntarily moved to South Carolina with [Damon] during this case, while the child remained placed locally . . . ch[oosing] to put distance between herself and the child's placement then but now object[ing] to the same[.]" The juvenile court emphasized that the Mother could visit both physically and virtually -- "just as she was voluntarily doing from South Carolina" -- and that the Mother could continue to work on her case plan while the child lives with the paternal grandparents. Finally, the juvenile court recognized the effort that the paternal grandmother had put into supporting A. S. and forming a relationship with the child,

including attending numerous court dates and visiting with the child monthly. The juvenile court noted that "[t]he State of Florida has approved her home as a placement for the child" and concluded that the paternal grandmother "is able to meet all the child's needs as placement." Given these determinations, the trial court concluded that the new placement was in the best interest of A. S. and would not materially affect the Mother's ability to satisfy her case plan. The Mother now appeals this decision.

We begin by noting that, as required by law for a placement change, the juvenile court here noticed and conducted a hearing, received evidence and testimony from a variety of sources, considered the needs of A. S., and made findings of fact concerning the Department's proposed placement for A. S. See OCGA § 15-11-215 (a), (e), and (f). The Mother does not challenge the underlying process used to evaluate A. S.'s place or claim that the juvenile court's findings are unsupported by the record; in fact, the Mother recognizes that her abusive relationship with Damon is the basis for A. S.'s dependency, and she admits that "[t]his abusive relationship continues." Instead, her one-page argument -- which lacks citations to either the record or legal authority -- asserts that she is "making progress on her case plan" and that placing A. S. in Florida

imposes "an undue burden on [the Mother] to enable visits, which in turn causes the child harm due to the lack of communication with [the Mother]." In short, the Mother asks this Court to re-evaluate the evidence presented below and to impose our judgment for that of the juvenile court; this we cannot and will not do. As we have explained before under similar circumstances,

> [w]e cannot substitute our judgment for a juvenile court's judgment that relative placement [is] in the best interest of a child. The [juvenile] court had the opportunity to question and observe the parties and witnesses, and [the juvenile court] possesses a wide discretion in determining the issues before it, and if the judgment is supported by any evidence and is not clearly erroneous, an appellate court is not authorized to set it aside.

(Citations and punctuation omitted.) *In re S.R.C.J.*, 317 Ga. App. 699, 704 (3) (732 SE2d 547) (2012). Here, there is ample evidence to support the juvenile court's factual findings and to support the juvenile court's ultimate conclusion that A. S. is best served by being placed with her paternal grandmother in Florida. Accordingly, we must uphold the judgment of the juvenile court.

*Judgment affirmed. Barnes, P. J., and Gobeil, J., concur.*

8